UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION,
Solely as Trustee,

                Plaintiff,            16 Civ. 8963

    -against-                    OPINION

TELOS CLO 1006-1 LTD.; TELOS CLO 2006-1,
INC.; TELOS ASSET MANAGEMENT LLC;
ELLINGTON CREDIT OPPORTUNITIES, LTD.;
CEDE & CO. AS NOMINEE FOR THE
DEPOSITORY TRUST COMPANY; GOLDMAN
SACHS & CO.; HARE & CO.; LLC;
KNOTFLOAT CO.; MAC & CO, LLC; BK
OPPORTUNITIES FUND SP; TIPTREE
OPERATING COMPANY LLC; and
JOHN DOES 1 THROUGH 100,

                Defendants.

-----------------------------------------X

A P P E A R A N C E S :



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/7/17

        Attorney for Plaintiff

        LOCKE LORD BISSELL & LIDDELL LLP
        3 World Trade Financial Center, 20th Floor
        New York, NY 10281
        By: Casey B. Howard, Esq.

        Attorneys for Telos and Tiptree

        WINSTON & STRAWN LLP
        200 Park Avenue
        New York, NY 10166
        By: Cristina I. Calvar, Esq.
            Ian C. Eisner, Esq.
            Richard W. Reinthaler, Esq.

Attorneys for Ellington and BK Opportunities

SCHINDLER COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, NY 10005
By:  Lisa C. Cohen
     Karen M. Steel

**Sweet, D.J.**

Interpleader defendant Telos Asset Management LLC ("Telos" or "Collateral Manager") has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the interpleader action brought by plaintiff, The Bank of New York Mellon Trust Company, National Association ("Plaintiff," "BNYM," or the "Trustee") and to grant its counterclaims for declaratory judgment. Based upon the conclusions set forth below, the motion of Telos is denied without prejudice to renew after further proceedings.

The instant motion raises the issue of the proper timing and procedure to resolve the dispute between the parties with respect to the performance of the Indenture, which establishes their rights and obligations. For the reasons set forth below, it is concluded that the most appropriate procedure

1

to protect the rights of all the parties is the pending action, and the motion for summary judgment is deemed premature.

## I. Prior Proceedings

On November 21, 2006, Telos CLO 2006-1 Ltd., as Issuer (the "Issuer"); Telos CLO 2006-1, Inc., as Co-Issuer (the "Co-Issuer", and together with the Issuer, the "Co-Issuers"); and BNYM, in its capacity as Trustee (the "Trustee") entered into an indenture (the "Indenture") in connection with a collateralized loan obligation ("CLO") transaction. Telos' Answer, Statement of Claim to the Funds, and Verified Counterclaims Against The Bank of New York Mellon Trust Company ("Telos Answer") ¶ 26. Pursuant to the terms of the Indenture, the Co-Issuers issued eight classes of Secured Notes. Telos' Statement of Material Facts in Support of Telos' Motion for Summary Judgment ("Telos Statement of Facts") ¶ 8. The Issuer also entered into a Subordinated Note Issuing and Paying Agency Agreement (the "Subordinated Note Agreement") with BNYM; pursuant to that agreement, the Issuer issued Subordinated Notes. Telos Answer ¶ 4.

Additionally, on the same date, the Issuer entered into a Collateral Management Agreement (the "CMA") with Telos

2

(f/k/a Tricadia Loan Management LLC) in which Telos agreed to act as Collateral Manager for distributions made on Distribution Dates to subordinated noteholders. As Collateral Manager, Telos was to provide certain management services with respect to the CLO transaction. The management services include: "(i) identify[ing] and purchas[ing] Collateral on behalf of the [Issuer]; and (ii) retain[ing], sell[ing] or otherwise dispos[ing] of any Collateral Debt Obligation or other asset as required or permitted under the Indenture." Telos Statement of Facts ¶ 19.

By the terms of the Indenture and the CMA, on the Distribution Dates Telos is entitled to receive an Incentive Collateral Management Fee (the "ICM Fee"), subject to and in accordance with the payment priority, or "waterfall," provisions as set forth in Sections 11.1(a) and 11.2(a) of the Indenture. Telos Statement of Facts ¶¶ 18, 28. The waterfalls guide the order of payment, and therefore the amount of the ICM Fee is affected by which waterfall is applied: the "regular waterfall" or the "redemption waterfall." Telos Statement of Facts ¶¶ 28-29. Under a regular waterfall, the ICM Fee is higher, and the distributions to subordinated noteholders is lower.

Ellington Credit Opportunities, Ltd. ("Ellington") and BK Opportunities Fund SP ("BK") (collectively, the "Subordinate Noteholders") may also be entitled to a distribution on a given Distribution Date, which varies in size according to, among other things, the size of the ICM Fee on that Distribution Date. The distribution that the Subordinate Noteholders may be entitled to and the ICM Fee are inversely proportional. Telos Answer ¶¶ 4, 34.

On the October 11, 2016 Distribution Date, if the regular waterfall were applied, Telos would have been entitled to an ICM Fee of $2,362,097.49. Telos Answer ¶ 35; Telos Statement of Facts ¶ 42.

However, on October 11, 2016, the Trustee received correspondence from Ellington objecting to the ICM Fee and the recent sales of Collateral. Telos Answer ¶ 36; *see* Telos Statement of Facts ¶ 46. In that correspondence, Ellington stated that the decision to accelerate redemption of the Notes in the deal "may reflect bad faith on the part of the Trustee." Edrington Decl. ¶ 2, Ex. A.

The Trustee subsequently received several directions from Telos demanding that the Trustee distribute the ICM Fees that Telos would have been paid pursuant to the regular waterfall. Telos Answer ¶ 37-38. In Telos' October 28, 2016 letter to the Trustee, Telos directed the Trustee to pay Telos the ICM Fees, alleged that the Trustee had violated the terms of the Indenture and related agreements, and "expressly reserve[d] all of their rights, including rights against the Trustee under the Indenture." Edrington Decl. ¶ 3, Ex. B; Telos Answer ¶ 38.

On November 1, 2016, the Trustee sent a letter to both Telos and Ellington through their respective counsel, notifying them that the Trustee had reviewed the correspondence from both parties and that the Trustee may file an interpleader action if the parties did not come to an agreement on or before November 15, 2016. Answer ¶ 39 (admitting this allegation from the Complaint). Further, in a subsequent November 2, 2016 letter to the Trustee, Telos requested the Trustee to "please immediately file an interpleader" in the event the Trustee was not willing to immediately distribute the ICM Fees to Telos. Edrington Decl. ¶ 4, Ex. C.

On November 17, 2016, the Trustee initiated this action by filing an interpleader complaint asserting that it faces competing demands to assets it holds in connection with the CLO transaction. *See* Complaint, Dkt. No. 1. In particular, the Complaint alleges that Telos directed the Trustee to pay it the ICM Fee for the October 11, 2016 Distribution Date (the "Disputed Funds") while Ellington requested the Trustee to withhold payment to Telos. The Trustee has no claim to any of the Disputed Funds. On or about January 11, 2017, a reserve was established with the expectation that this reserve could be used to pay for the Trustee's fees and costs incurred in this interpleader action. Edrington Decl. ¶ 5. The Trustee filed an Amended Interpleader Complaint on January 27, 2017, which, among other things, added BK as a party.

On February 19, 2017, BK and Ellington each filed substantially similar pleadings answering the Amended Interpleader Complaint and asserting cross-claims (the "Cross-Claims") against Telos, in which they allege that Telos committed fraud, breach of contract, gross negligence, and breach of fiduciary duty, and is thus not entitled to the Disputed Funds. Dkt. Nos. 64 & 65.

On that date, Telos also responded to the Amended Interpleader Complaint by filing an Answer, Statement of Claim to the Funds, and Verified Counterclaims (the "Counterclaims") against the Trustee, alleging that the Governing Documents[1] require that the Trustee pay Telos the ICM Fees regardless of BK and Ellington's claims that Telos engaged in various misconduct. Dkt. No. 66. Telos alleged that the Trustee's withholding of the Disputed Funds, and its corresponding filing of the interpleader action, was improper and in breach of the Indenture and seeks declaratory relief demanding that the Disputed Funds be paid and prohibiting the Trustee from paying its costs and fees out of the interpleaded funds.

Telos filed the instant motion for summary judgment seeking dismissal of the Trustee's Amended Interpleader Complaint and payment of the Disputed Funds on March 1, 2017. Dkt. Nos. 69-72. Telos has asserted that its motion applies only

---

[1] The "Governing Documents" shall refer to the Indenture, dated as of November 21, 2006 (the "Indenture"), among Telos CLO, as Issuer; Telos CLO 2006-1, Inc. as Co-Issuer; and The Bank of New York Mellon Trust Company, National Association (the "Trustee"), the Subordinated Note Issuing and Paying Agency Agreement between Telos CLO 2006-1 Ltd. and the Trustee, dated as of November 21, 2006 (the "Subordinated Note Agreement"); the Collateral Management agreement between Telos CLO 2006-1 and Telos, dated as of November 21, 2006 (the "CMA"); and the Collateral Administration Agreement between Telos CLO 2006-1, Telos, and the Trustee, dated November 21, 2006 (the "Collateral Administration Agreement").

to the Trustee's claims and Telos' Counterclaims, and not to the Cross-Claims by Ellington and BK.

On March 27, 2017, BK and Ellington served Telos with document requests and interrogatories seeking discovery concerning, *inter alia*: Telos' interpretation of the Governing Documents, including the Optional Redemption and its impact on the amount of ICM Fees owed; liquidation of the assets underlying Telos CLO 2006-1; holding of these same assets in other CLO transactions it manages; communications with the Trustee, including with respect to the NOTE VALUATION REPORT and ICM Fees purportedly owed; and meetings and communications with the Subordinated Noteholders. *See* Steel Decl. ¶¶ 4-5, Exs. C & D.

The instant motion was heard and marked fully submitted on May 10, 2017.

## II. The Facts

The facts have been set forth in the Telos Statement of Facts, Interpleader Plaintiff's Response and Counterstatement ("BNYM Counterstatement"), and Ellington Credit Opportunities

Ltd. and BK Opportunities Fund Counterstatement of Material Facts ("Ellington and BK Counterstatement") pursuant to Local Rule 56.1, and are not in dispute except as noted below.

1. Telos is an asset manager focused on, among other things, senior secured corporate credit, primarily in the form of CLOs. Among other obligations, Telos manages Telos CLO 2006-1 Ltd., the Issuer. Telos Answer ¶ 2.

2. Interpleader plaintiff and counterclaim defendant BNYM operates as a nationally-chartered trust company that provides, among other things, custody and trust services, including with respect to CLOs. *Id.* at ¶ 3.

BNYM disputes this, stating that it is a limited partnership national bank association with trust power. BNYM Counterstatement ¶ 2.

4. In November 2006, Telos sponsored the formation of the Telos CLO, a special-purpose entity created to invest in a portfolio of loans and other debt instruments and to issue senior (*i.e.*, secured) note securities and subordinated note

securities backed by the portfolio. Telos Answer ¶ 4; McCormick Decl. ¶ 4.

BNYM as Trustee takes no position.

3.  Interpleader defendants and crossclaim plaintiffs Ellington and BK are alleged holders of Subordinated Notes issued in connection with the Telos CLO. Compl. ¶¶ 12, 19.

5.  The Telos CLO makes distribution payments pursuant to a priority of payment waterfall that requires, inter alia, the payment of certain management fees payable to Telos, as the Collateral Manager, in connection with the Telos CLO, the payment of distributions to Subordinated Noteholders after payments of amounts due to the Secured Noteholders and certain of the expenses of the issuer. Answer ¶ 4; McCormick Decl. ¶ 4).

BNYM as Trustee takes no position.

6.  As of October 11, 2016, all of the Secured Noteholders have been paid in full and the Telos CLO has, to date, been profitable for the Subordinated Noteholders, with an internal rate of return in excess of twenty percent per annum over ten years. Telos Answer ¶ 5; McCormick Decl. ¶¶ 4, 13.

10

BNYM as Trustee takes no position.

7. Since inception, the Telos CLO has cumulatively returned over $100 million, including principal, to Subordinated Noteholders. Telos Answer ¶ 5; McCormick Decl. ¶ 4.

BNYM as Trustee takes no position.

8. The Telos CLO issued eight classes of Secured Notes pursuant to an Indenture, dated as of November 21, 2006 (as amended, modified, or supplemented), McCormick Decl., Ex. A; [hereinafter the "Indenture"], among Telos CLO, as Issuer; Telos CLO 2006-1, Inc., as Co-Issuer; and BNYM, as Trustee. *See, e.g.,* Indenture §2.2(a) (describing "[t]he aggregate principal amount of Secured Notes which may be issued under th[e] Indenture").

BNYM as Trustee takes no position and refers to the Indenture for its complete terms.

9. Telos and the Secured Noteholders are express third party beneficiaries of the Indenture. *See* Indenture § 14.8.

11

10. No actual or purported Subordinate Noteholder (including Ellington or BK) is, in that capacity, a party to the Indenture or among the entities expressly identified as third party beneficiaries thereof. *Id.*

The BNYM as Trustee and the Subordinated Noteholders refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

11. With the proceeds received from the sale of Secured Notes, the Telos CLO purchased a diversified portfolio of loan obligations and other debt instruments securing the obligations of the Secured Noteholders.

BNYM as Trustee takes no position.

12. The principal and interest generated by the loan obligations and other collateral are used to, among other things, make interest and principal payments to the Secured Noteholders, pay the Telos CLO's expenses, and pay certain fees to Telos, in its capacity as Collateral Manager. *See* Indenture §§ 11.1, 11.2.

The Subordinated Noteholders and BNYM refer to the
Indenture for its complete terms and content. BNYM as Trustee
takes no position.

13.    Under the Indenture, the Telos CLO granted BNYM,
as Trustee for the benefit and security of the Secured Parties
(defined in the Indenture as the Secured Noteholders, the
Collateral Manager, and the Trustee), all the Telos CLO's
"right, title and interest" in the Collateral to secure the
Issuer's obligations to the Secured Parties under the Indenture.
*See* Indenture, Granting Clauses.

The Subordinated and the BNYM refer to the Indenture
for its complete terms and content. BNYM as Trustee takes no
position.

14.    Such grant under the Indenture was made to BNYM,
as Trustee, to hold in trust in order to secure, among other
things, the payment of (i) "all amounts due on the Secured Notes
in accordance with their respective terms," subject to certain
conditions set forth in the Indenture, and (ii) "all other sums
payable under [the] Indenture," including, as alleged in greater

detail below, any management fees owed to Telos. *See* Indenture, Granting Clauses.

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

15.   In accordance with the Indenture's terms, the Telos CLO also issued Subordinated Notes pursuant to the Subordinated Note Issuing and Paying Agency Agreement between the Telos CLO and BNYM (in its capacity as the Subordinated Note Issuing and Paying Agent) dated as of November 21, 2006. *See* McCormick Decl., Ex. B [hereinafter, the "Subordinated Note Agreement"].

The Subordinated Noteholders and BNYM refer to the Governing Documents for its complete terms and content. BNYM as Trustee takes no position.

16.   The Subordinated Notes are not secured by the Indenture. *See* Subordinated Note Agreement, Preliminary Statement.

The Subordinated Noteholders and BNYM refer to the
Governing Documents for its complete terms and content. BNYM as
Trustee takes no position.

17. The Telos CLO retained Telos on or about November
21, 2006 to provide certain management services with respect to
the Telos CLO. *See* McCormick Decl., Ex. C, Collateral Management
Agreement dated November 21, 2006, by and between the Telos CLO
and Telos ("CMA").

The Subordinated Noteholders and BNYM refer to the CMA
for its complete terms and content. BNYM as Trustee takes no
position.

18. In return for rendering services as the
Collateral Manager, Telos is entitled to certain management fees
in accordance with the CMA and the Indenture. *See* Indenture §§
11.11, 11.2; CMA § 8(a).

The Subordinated Noteholders and BNYM refer to the
Governing Documents for its complete terms and content. BNYM as
Trustee takes no position.

15

19. As Collateral Manager, Telos is authorized to, among other things, (i) identify and purchase Collateral on behalf of the Telos CLO; and (ii) retain, sell or otherwise dispose of any Collateral Debt Obligation or other asset as required or permitted under the Indenture. *See* CMA § 2(e).

The Subordinated Noteholders and BNYM refer to the CMA for its complete terms and content. The BNYM as Trustee takes no position.

20. While BNYM is not an express party to the CMA, under Section 15.1 of the Indenture (and as acknowledged by the Collateral Manager in Section 22 of the CMA), the Telos CLO, as Issuer, pledges to BNYM, as Trustee, "all of the Issuer's estate, right, title and interest in, to and under the CMA" for the "benefit and on behalf of the Secured Parties."

The Subordinated Noteholders and BNYM refer to the Governing Documents for its complete terms and content. The BNYM as Trustee takes no position.

21. Concurrently with the execution of the Indenture, the CMA, and the Subordinated Note Agreement, Telos CLO, Telos

(in its capacity as Collateral Manager), and BNYM (in its capacity as Collateral Administrator) executed a Collateral Administration Agreement, dated November 21, 2006. *See* McCormick Decl., Ex. D.

The Subordinated Noteholders and BNYM refer to the Collateral Administration Agreement for its complete terms and content. The BNYM as Trustee takes no position.

22.   Pursuant to the Collateral Administration Agreement, BNYM is required to perform, inter alia, "certain specified obligations of the Issuer under the Indenture," as well as certain obligations of Telos under the Indenture or the CMA. *See* Collateral Administration Agreement, Recitals.

The Subordinated Noteholders and BNYM refer to the Collateral Administration Agreement for its complete terms and content.

BNYM states that it complied with all of its obligations under the Collateral Agreement and all related agreements during the subject time period.

17

23. Section 2(a) of the Collateral Administration Agreement provides that BNYM must (i) assist Telos "with monitoring the Collateral on an ongoing basis," and (ii) provide to the Telos CLO and Telos "certain reports, schedules and other data" that the Telos CLO or Telos is required to prepare and deliver under the Indenture.

The Subordinated Noteholders and BNYM refer to the Collateral Administration Agreement for its complete terms and content.

BNYM, as Trustee, affirmatively states that it complied with all of its obligations under the Indenture and all related agreements during the subject time period and takes no position as to the allegations.

24. Section 10.9(b) of the Indenture, titled "Distribution Date Accounting," provides that the Telos CLO must render or cause to be rendered an accounting, referred to as a "Note Valuation Report," to, inter alia, Telos and the Trustee in advance of a Distribution Date. Section 2 of the Collateral Administration Agreement requires that BNYM, in its capacity as Collateral Administrator, calculate and prepare the Note

Valuation Report on behalf of the Telos CLO. *See* Collateral Administration Agreement §§ 2(a), (c) and (h).

The Subordinated Noteholders and BNYM refer to the Collateral Administration Agreement for its complete terms and content.

BNYM, as Trustee, affirmatively states that it complied with all of its obligations under the Indenture and all related agreements during the subject time period and takes no position as to the allegations.

25.  The Note Valuation Report sets forth, among other information, the proceeds to be disbursed on the next Distribution Date, including administrative expenses and management fees, if any, due to Telos as the Collateral Manager. *See* Indenture §§ 10.9(b)(1)-(4).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

26.     Pursuant to Section 2(h) of the Collateral
Administration Agreement, Telos is required to "review and
verify" the Note Valuation Report. Once Telos approves the
report, BNYM, in its capacity as Collateral Administrator, is
required to transmit it to the Telos CLO for execution. *See*
Collateral Administration Agreement § 2(h).

The Subordinated Noteholders and BNYM refer to the
Indenture for its complete terms and content. BNYM as Trustee
takes no position.

27.     Section 10.9(b) of the Indenture makes clear that
BNYM, in its capacity as Trustee, must strictly adhere to the
distribution instructions set forth in the Note Valuation Report
after it is approved by Telos. This Section provides, in
pertinent part, that:

> Each Note Valuation Report shall constitute
> instructions to the Trustee to withdraw on the
> related Distribution Date from the Payment
> Account and pay or transfer amounts set forth in
> such report in the manner specified, and in
> accordance with the priorities established in,
> Section 11.1(a).

Indenture § 10.9(b).

The Subordinated Noteholders dispute that "Section 10.9(b) of the Indenture makes clear BNYM, in its capacity as Trustee, must strictly adhere to the distribution instructions set forth in the Note Valuation Report after it is approved by Telos," as the Indenture does not say that. Indenture § 10.9(b).

BNYM, as Trustee, affirmatively states that it complied with all of its obligations under the Indenture and all related agreements during the subject time period and takes no position as to the allegations.

28. Section 11.1(a) of the Indenture, titled "Disbursement of Cash from Payment Account," is a "waterfall" provision that specifies the priority of payments to be disbursed by the Trustee on a Distribution Date. Section 11.1(a) provides, in pertinent part:

> Notwithstanding any other provision in this Indenture, but subject to the other clauses of this Section 11 and Section 13.1, on each Distribution Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(f) as follows and for application by the Trustee in accordance with the following priorities (the Priority of Payments) . . .

Indenture § 11.1(a).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

29. Sections 11.1(a)(i)(V) and 11.1(a)(ii)(P) of the Indenture provide that on each Distribution Date, the Collateral Manager will be paid an Incentive Collateral Management Fee, subject to and in accordance with the waterfall provisions. Indenture §§ 11.1(a)(i)(V), 11.1(a)(ii)(P).

The Subordinated Noteholders dispute this statement to the extent it interprets Sections 11.1(a)(i)(V) and (ii)(P) to require payment of ICM Fees and note that Section 11.1(a) contemplates that such fees not be paid during a particular Distribution Date because it provides for "the payment to the Collateral Manager of the Incentive Collateral Management Fee (if any)." Indenture § 11.1(a)(i)(V). They also state that the Statement ignores, *inter alia*, Section 8(a) of the CMA, which requires that Telos "perform[] . . . its obligations under the Agreement" before it may receive an Incentive Collateral Management Fee. CMA § 8(a).

BNYM as Trustee takes no position.

22

30. Section 11.2(a) of the Indenture, titled "Post-Enforcement Disbursement of Cash from Payment Account," is a conditional waterfall provision that specifies the priority of payments to be disbursed by the Trustee in connection with certain events, including the exercise of an Optional Redemption. This Section provides, in pertinent part:

> In connection with (i) any Optional Redemption or Tax Redemption (ii) a declaration of acceleration by the Trustee following the occurrence of an Event of Default, (iii) the enforcement of the security interest granted in the Collateral or (iv) the liquidation of the Collateral on the Stated Maturity of the Notes, Interest Proceeds, Principal Proceeds and/or net proceeds of the enforcement of the security over the Collateral or, as applicable, the liquidation of the Collateral will be applied in the order of priority set forth under clauses (A) through (N) below (the Post-Enforcement Priority of Payments).

Indenture § 11.2(a).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

31. Similar to Section 11.1(a), Section 11.2(a)(M) provides that, in connection with an Optional Redemption, the

23

Collateral Manager will be paid an ICM Fee. Indenture §
11.2(a)(M).

The Subordinated Noteholders dispute this statement to
the extent it interprets Sections 11.1(a)(M) to require payment
of ICM Fees and note that Section 11.2(a)(M) contemplates that
such fees not be paid during a particular Distribution Date
because it provides for "the payment to the Collateral Manager
of the Incentive Collateral Management Fee (if any)." Indenture
§ 11.2(a)(M). They also state that the Statement ignores, *inter
alia*, Section 8(a) of the CMA, which requires that Telos
"perform[] . . . its obligations under the Agreement" before it
may receive an ICM Fee. CMA § 8(a). BNYM as Trustees takes no
position.

32.  "Optional Redemption" is defined in Section
9.1(a) of the Indenture, which provides, in pertinent part:

> The Secured Notes shall be redeemable, in whole
> but not in part, on any Distribution Date at the
> option of the Issuer (such redemption, an
> Optional Redemption) from Sale Proceeds and all
> other funds standing to the credit of the
> Collection Account, the Uninvested Proceeds
> Account, the Expense Account, the Interest
> Reserve Account, the Future Funding Account and
> the Payment Account on such Distribution Date, at
> the direction of a Special Majority of

Subordinated Notes, at the applicable Redemption
Price ...

Indenture § 9.1(a).

The Subordinated Noteholders and BNYM refer to the
Indenture for its complete terms and content. BNYM as Trustee
takes no position.

33. In the event that a Special Majority of
Subordinated Notes (defined in Section 1.1 of the Indenture as
Holders of more than 66-2/3% of the Aggregate Outstanding Amount
of Subordinate Notes) directs the Issuer to call an Optional
Redemption, Section 9.2 of the Indenture requires that the
Issuer notify the Trustee of the Optional Redemption by a
specified period of time. That section states:

> In the event of any redemption pursuant to
> Section 9.1, the Issuer shall, at least 15
> Business Days (but not more than 90 days) prior
> to the Redemption Date (unless the Trustee shall
> agree to a shorter notice period), notify the
> Trustee, and each Paying Agent of such Redemption
> Date, the applicable Record Date, the principal
> amount of each Class of Secured Notes to be
> redeemed on such Redemption Date and the
> Redemption Price of such Secured Notes in
> accordance with Section 9.1.

Indenture § 9.2.

25

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

34. The Indenture also requires that the Trustee, in turn, provide notice of the Optional Redemption by a specified period of time. Section 9.3 states, in pertinent part:

> Notice of redemption pursuant to Section 9.1 or the Maturity of any Class of Secured Notes shall be given by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the applicable Redemption Date or Maturity to each Holder of Secured Notes to be redeemed pursuant to Section 9.1 or to mature at such Holder's address in the applicable Secured Note Register, and to the Subordinated Note Issuing and paying Agent with a copy to each Rating Agency.

Indenture § 9.3.

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

35. An Optional Redemption, as that term is defined in the Indenture, only concerns Secured Notes, not Subordinated Notes. *See, e.g.*, Indenture §§ 9.1, 9.2, 9.3.

The Subordinated Noteholders dispute this statement and note that, under the Indenture, an Optional Redemption is called by the majority of Subordinated Noteholders and impacts payment of Subordinated Notes under the Indenture. Indenture §§ 9.1-9.3. BNYM refers to the Indenture for its terms and as Trustee takes no position.

36. It is undisputed that no direction to redeem the Secured Notes was ever provided to the issuer by a Special Majority of Subordinated Noteholders, no notice of Optional Redemption was ever provided by the Issuer to the Trustee, and no notice of Optional Redemption was ever provided by the Trustee to the Holders of Secured Notes in connection with the October 11, 2016 Distribution Date.

The Subordinated Noteholders note that Telos knew at all times that they would be calling an Optional Redemption and that no direction was provided prior to October 11, 2016 due to Telos' fraud, breach of contract, and other misconduct. *See* Answer and Cross-Claims of Ellington Credit Opportunities, Ltd., Answer and Cross-Claims of BK Opportunities Fund SP (collectively, the "Cross-Claims") ¶¶ 3-11; 39-53. BNYM as Trustee takes no position.

37. Because the Secured Notes were paid in full on October 11, 2016, it was no longer possible after that date for Subordinate Noteholders to call an Optional Redemption and thereby trigger the application of the "redemption" waterfall under Section 11.2(a) of the Indenture, whether in connection with the January 11, 2007 Distribution Date or any future Distribution Date. *See, e.g.*, Indenture § 9.1; Subordinated Note Agreement § 6.1.

The Subordinated Noteholders dispute this statement and state that no limitation on the right to call an Optional Redemption appears in the Indenture or in any of the other Governing Documents, and the calling of an Optional Redemption is intended to benefit and protect the Subordinated Noteholders. Indenture §§ 9.1, 11.2. They further state that Telos knew at all times that the Subordinated Noteholders would be calling an Optional Redemption and that no direction was provided prior to October 11, 2016 due to Telos' fraud, breach of contract, and other misconduct. *See* Cross-Claims ¶¶ 3-11; 39-53. BNYM as Trustee refers to the Indenture and Subordinated Note Agreement for their terms and takes no position.

38. Among the disbursements required under the

Indenture's "waterfall" provisions is an Incentive Collateral

Management Fee due to Telos if certain conditions are satisfied.

*See* Indenture § 11.1(a).

The Subordinated Noteholders refer to the Governing

Documents for their terms and content. BNYM as Trustee refers to

the Indenture and Subordinated Note Agreement for their terms

and takes no position.

39. Section 8(a) of the CMA provides, in pertinent

part, that:

> [A]s compensation for services rendered and for
> performance of its obligations under [the CMA],
> the Issuer shall pay to the Collateral Manager …
> if applicable, the Incentive Collateral
> Management Fee … on each Distribution Date, to
> the extent funds are available for such purpose
> in accordance with the Priority of Payments set
> forth in the Indenture.

The Subordinated Noteholders refer to the CMA for its

complete terms and content and note that CMA Section 8(a)

requires that Telos "perform[] . . . its obligations under the

Agreement" before it may receive an Incentive Collateral

Management Fee, including but not limited to Section 2(b)'s

29

requirement that Telos "act in good faith and exercise reasonable care . . . in a commercially reasonable manner." (Steel Ex. B, CMA § 8(a).)

BNYM as Trustee refers to the CMA and Subordinated Note Agreement for their terms and takes no position.

40. Section 1.1 of the Indenture defines the Incentive Collateral Management Fee as follows:

> [A] fee payable on each Distribution Date on or after the Distribution Date on which the Subordinated Noteholders have received or will receive an annualized Internal Rate of Return of at least 12% for the period from the Closing Date to such Distribution Date (after taking into account any payments made or to be made on the Subordinated Notes on such Distribution Date and all prior Distribution Dates in accordance with the Priority Payments), in an amount, with respect to any Distribution Date, equal to 20% of (x) the Interest Proceeds (if any) available after the payment of amounts pursuant to clauses (A) through (U) of Section 11.1(a)(i) and (y) the Principal Proceeds (if any) available after the payment of amounts pursuant to clauses (A) through (O) of Section 11.1(a)(ii).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

30

41.   On or around October 4, 2016, BNYM, acting in its capacity as Collateral Administrator, prepared and presented to Telos for its approval a Note Valuation Report specifying the distributions required by the "waterfall" provision in Section 11.1(a) of the Indenture in connection with the then-upcoming October 11, 2016 Distribution Date. *See* McCormick Decl. Ex. E, [hereinafter the "October 2016 Note Valuation Report"] at 4; *see also* McCormick Decl. ¶ 9).

The Subordinated Noteholders dispute that the Governing Documents unconditionally "require" that the distributions set forth in the NOTE VALUATION REPORT be paid and note that Section 11.2(a)(M) contemplates that such fees not be paid during a particular Distribution Date because it provides for "the payment to the Collateral Manager of the Incentive Collateral Management Fee (if any)." Indenture § 11.2(a)(M). They state that under Section 8(a) of the CMA, Telos must "perform[] . . . its obligations under the Agreement" before it may receive an ICM Fee. CMA § 8(a).

BNYM states that it complied with all of its obligations under the Collateral Administration Agreement and

all related agreements during the subject time period and as Trustee takes no position.

42. The Note Valuation Report prepared by BNYM provided, among other things, that Telos was entitled to an ACM Fee in the amount of $2,362,097.49 pursuant to Section 11.1(a) of the Indenture, as all conditions relating thereto had been satisfied. *See* October 2016 Note Valuation Report; McCormick Decl. ¶ 11.

The Subordinated Noteholders dispute that the Governing Documents provide that Telos is unconditionally "entitled" to the Incentive Collateral Management Fee set forth in the October 2016 Note Valuation Report and note that Section 11.2(a)(M) contemplates that such fees not be paid during a particular Distribution Date because it provides for "the payment to the Collateral Manager of the Incentive Collateral Management Fee (if any)." Indenture § 11.2(a)(M). They state that under Section 8(a) of the CMA, Telos must "perform[] . . . its obligations under the Agreement" before it may receive an ICM Fee. CMA § 8(a). The Subordinated Noteholders also dispute the characterization that the Trustee "prepared" the Note Valuation Report because, under Indenture Section 10.8, Telos

was the source of the Note Valuation Report's information about the value of the collateral and the amount of fees to be paid. Indenture § 10.8.

BNYM as Trustee takes no position.

43. On or around October 7, 2016, Telos approved the Note Valuation Report pursuant to Section (h) of the Collateral Administration Agreement. *See* October 2016 Note Valuation Report 3-5; McCormick Decl. ¶ 10.

The Subordinated Noteholders note that, under Indenture Section 10.8, Telos was the source of the Note Validation Report's information about the value of the collateral and the amount of fees to be paid. Indenture § 10.8.

BNYM as Trustee takes no position.

44. BNYM did not strictly adhere to the payment instructions set forth in the Note Valuation Report for the October 11, 2016 Distribution Date as required by, inter alia, Sections 10.9(b) and 11.1(a) of the Indenture. Compl. ¶¶ 5, 47.

33

The Subordinated Noteholders do not dispute that the Trustee withheld payment of ICM Fees to Telos, but otherwise dispute Telos' characterization of the Indenture, and, in particular, that Sections 10.9 and 11.1(a) unconditionally require payment of the ICM Fees set forth in the Note Valuation Report and note that Section 11.2(a)(M) contemplates that such fees not be paid during a particular Distribution Date because it provides for "the payment to the Collateral Manager of the Incentive Collateral Management Fee (if any)." Indenture § 11.2(a)(M). They also state that under Section 8(a) of the CMA, Telos must "perform[] . . . its obligations under the Agreement" before it may receive an ICM Fee. CMA § 8(a).

BNYM as Trustee affirmatively states that it complied with all of its obligations under the Indenture during the subject time period and refers to the Amended Interpleader Complaint for a complete statement of its terms and except as otherwise stated takes no position as to the allegations stated in paragraph 44.

45.    Instead, BNYM withheld the ICM Fee due to Telos in connection with the October 11, 2016 Distribution Date

despite distributing all other proceeds pursuant to the Note Valuation Report. *Id.*; McCormick Decl. ¶ 12.

BNYM as Trustee take no position.

46. BNYM subsequently informed Telos that it had withheld the ICM Fee because Ellington, an alleged holder of Subordinated Notes, told BNYM that "it would be improper" to distribute the fee to Telos because Ellington had intended to "call an Optional Redemption under Section 9.1(a) of the Indenture." Compl. ¶¶36, 40; McCormick Decl. ¶ 14.

The Subordinated Noteholders refer to the Complaint and Amended Complaint filed by the Trustee for its terms and content.

BNYM as Trustee states that on October 11, 2016, the Trustee received a request from Ellington not to distribute the ICM Fee to Telos and in addition to objecting to the payment of the ICM Fee, Ellington also objected to the recent sales of Collateral and that, pursuant to Ellington's request, on the October 11, 2016 Distribution Date, the Trustee held the $2,362,097.49 earmarked for the ICM Fee under Section 11.1(a) of

35

the Indenture. The Trustee further refers to the Indenture for a complete statement of its terms and otherwise takes no position.

47.   Neither Ellington nor any other actual or purported Subordinated Noteholder, let alone holders of a Special Majority of the Subordinated Notes as required under Section 9.1(a) of the Indenture, has ever submitted the requisite notice directing the issuer to call an Optional Redemption of the Secured Notes in connection with the October 11, 2016 Distribution Date or an optional redemption of the Subordinated Notes in connection with the January 11, 2017 Distribution Date or any other Distribution Date. *See* Indenture § 9.1(a); Subordinated Note Agreement § 6.1; McCormick Decl. ¶¶ 19-21.

The Subordinated Noteholders state that Telos knew at all times that the Subordinated Noteholders would be calling an Optional Redemption and that no direction was provided prior to October 11, 2016 due to Telos' fraud, breach of contract, and other misconduct. *See* Cross-Claims ¶¶ 3-11; 39-53.

BNYM as Trustee refers to the Indenture and the Subordinated Note Agreement.

48.  BNYM, as Trustee, has no authority under the Indenture to withhold the ICM Fee Set forth in the Note Valuation Report Merely because Ellington, an alleged holder of Subordinated Notes, has objected to the payment of such fee. *See* Indenture § 11.1(a).

The Subordinated Noteholders dispute this statement, and further provide that the Trustee has the authority under the interpleader statute - 28 U.S.C. § 1335 - and under the Governing Documents to withhold the ICM Fee and bring this Interpleader Action. In particular, Section 8(a) of the CMA expressly provides that the ICM Fee shall be paid "as compensation for services rendered and for performance of its obligations under this Agreement." CMA § 8(a). Article 2 of the CMA, entitled General Duties of the Collateral Manager, enumerates several obligations of Telos as collateral manager, which it must perform in order to receive its fees, one of the express obligations imposed on Telos as collateral manager is that it "shall act in good faith and exercise reasonable care . . . in a commercially reasonable manner," *id.* § 2(b), and the CMA also states that Telos' failure to abide by Section 2(b) constitutes a Collateral Manager Breach:

Collateral Manager Breach means (i) acts or
omissions of the Collateral Manager . . .
constituting bad faith, willful misconduct or
gross negligence in the performance, or reckless
disregard, of the obligations of the Collateral
Manager hereunder and under the terms of the
Indenture applicable to the Collateral Manager
. . . .

*Id.* § 1(a).


BNYM as Trustee states that it complied with all of
its obligations under the Indenture and all related agreements
during the subject time period, refers to the Amended
Interpleader Complaint for a complete statement of its terms and
takes no position.


49. There is no provision in the Indenture that
authorizes the Trustee, or empowers the Subordinated
Noteholders, or a requisite majority thereof, to instruct the
Trustee to withhold any ICM Fee the Trustee is directed, and
thus contractually obligated, to pay pursuant to a particular
Note Valuation Report. *See* Indenture §§ 10.9, 11.1(a).


The Subordinated Noteholders dispute this statement,
and further provide that the Trustee has the authority under the
interpleader statute – 28 U.S.C. § 1335 – and under the

Governing Documents to withhold the ICM Fee and bring this
Interpleader Action, as set forth in their response to Telos'
Statement No. 48.

BNYM as Trustee states that it complied with all of
its obligations under the Indenture and all related agreements
during the subject time period, refers to the Amended
Interpleader Complaint for a complete statement of its terms and
takes no position.

50. Since filing its Complaint, BNYM has withheld an
additional ICM Fee of $485,057.55 due to Telos in connection
with the January 11, 2017 Distribution Date and, upon
information and belief, intends to withhold any additional ICM
Fee to which Telos may be entitled on any future Distribution
Date. See Monthly Report dated January 31, 2017, McCormick Decl.
Ex. F [hereinafter, the "January 2017 Monthly Report"];
McCormick Decl. ¶ 15.

The Subordinated Noteholders refer to the Amended
Interpleader Complaint for its complete terms and content.

BNYM as Trustee takes no position.

51.    The Indenture protects the Trustee when making disbursements pursuant to the instructions set forth in the approved Note Valuation Report on Distribution Dates. *See* Indenture §§ 6.1(c)(iii), 6.3(a).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

52.    Section 6.1 of the Indenture states, in relevant part:

> [T]he Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer, the Co-Issuer or the Collateral Manager in accordance with this Indenture . . .

Indenture §6.1(c)(iii).

The Subordinated Noteholders refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

53.    Section 6.3(a) of the Indenture states:

[T]he Trustee may conclusively rely and shall be
fully protected in acting or refraining from
acting upon any resolution, certificate,
statement, instrument, opinion, report, notice,
request, direction, consent, order, bond, note or
other paper or document (including the Note
Valuation Report) reasonably believed by it to be
genuine and to have been signed or presented by
the proper party or parties[.]

Indenture § 6.3(a).

The Subordinated Noteholders refer to the Indenture

for its complete terms and content. BNYM as Trustee takes no

position.

54. Section 1.1 of the Indenture defines

"Administrative Expenses" to include:

any amounts, including in respect of any
indemnities, due or accrued with respect to any
Distribution Date and payable by the Issuer or
the Co-Issuer to (i) the Trustee pursuant to
Section 6.8 . . . (ii) the Bank under the
Collateral Administration Agreement, . . . (iv)
the Subordinated Note Issuing and Paying Agent
under the Subordinated Note Issuing and Paying
Agency Agreement, . . . (vii) the Collateral
Manager under this Indenture and the CMA
(including amounts payable by the Issuer to any
Indemnified Party pursuant to Section 10 of the
CMA), . . . (x) any other Person in respect of
any other fees or expenses (including
indemnities) permitted under this Indenture and
the documents delivered pursuant to or in
connection with this Indenture and the Secured

41

Notes . . . provided that Administrative Expenses
shall not include (a) any amounts due or accrued
with respect to the actions taken on or in
connection with the Closing Date, (b) amounts
payable in respect of the Secured Notes or the
Subordinated Notes and (c) any Collateral
Management Fee payable pursuant to the CMA.

Indenture § 1.1.


The Subordinated Noteholders and BNYM refer to the

Indenture for its complete terms and content. BNYM as Trustee

takes no position.


55.   Section 6.8(a)(iii) of the Indenture states, in

pertinent part, that the Issuer will:

indemnify the Trustee and its Officers,
directors, employees and agents for, and to hold
them harmless against, any loss, liability or
expense incurred without negligence, willful
misconduct or Bad Faith on their part, arising
out of or in connection with the acceptance or
administration of this trust, including the costs
and expenses (including reasonable counsel fees)
of defending themselves against any claim or
liability in connection with the exercise or
performance of any of their powers or duties
hereunder . . .

Indenture § 6.8(a)(iii).

The Subordinated Noteholders and BNYM refer to the Indenture for its complete terms and content. BNYM as Trustee takes no position.

56.    After commencement of the instant action, pursuant to Section 10.9(a) of the Indenture, BNYM, as Collateral Administrator, prepared and circulated a Monthly Report to, among others, the Collateral Manager and the Trustee, providing that approximately $2,000,000 had been reserved for the payment of Administrative Fees. *See* January 2017 Monthly Report at 8; McCormick Decl. ¶¶ 16-17.

The Subordinated Noteholders refer to the January 2017 Monthly Report for its terms and content.

57.    BNYM and Telos agreed that this reserve for Administrative Expenses would cover, among other things, BNYM's legal fees and costs incurred in connection with the instant action subject to the satisfaction of certain conditions. McCormick Decl. ¶¶ 17-18.

The Subordinated Noteholders neither dispute nor confirm this statement.

BNYM as Trustee admits that a reserve for Administrative Expenses was set aside in order to cover, among other things, the Trustee's legal fees and costs in connection with the current action and, except as so admitted takes no position.

**III. Additional Facts by Subordinated Noteholders**

Numerous facts asserted by Telos in its motion for summary judgment and in affidavits submitted in support thereof are disputed by the following facts submitted by the Subordinated Noteholders.

1.   Ellington and BK hold Subordinated Notes in Telos CLO 2006-1. The Subordinated Notes are termed the "equity tranche" because they receive only residual cash flow after all senior notes are paid. Cross-Claim ¶ 20.

2.   When it became clear that the Secured Noteholders were to be paid off by about October 2016, Telos, as Collateral Manager, was obligated to continue to manage the collateral in the interests of the Subordinated Noteholders. More

44

specifically, Telos CLO 2006-1 is governed by the Indenture and the CMA, among other documents. Under those governing documents, Telos is compensated for its position as collateral manager by various fees, including the ICM Fees. Indenture §§ 11.1, 11.2; CMA § 8(a).

3.    Under the CMA, in order to receive these fees, Telos must perform certain duties set forth in the CMA. CMA §§ 2(b), 8(a).

4.    Section 8(a) of the CMA expressly provides that the ICM Fee shall be paid "as compensation for services rendered and for performance of its obligation under this Agreement." *Id.* § 8(a).

5.    Telos' duties are enumerated in Article 2 of the CMA, entitled General Duties of the Collateral Manager. In particular, Section 2(b) provides:

> The Collateral Manager, in performing its
> obligations under the Transaction Documents shall
> act in good faith and exercise reasonable care
> (i) using a degree of skill and attention no less
> than that which the Collateral Manager exercises
> with respect to comparable assets that it manages
> for itself or its Affiliates and (ii) without
> limiting the foregoing, in a commercially

> reasonable manner consistent with its
> understanding of accepted practices and
> procedures that are customarily applied by
> reasonable and prudent institutional managers of
> national standing in connection with the
> management of assets of the nature and the
> character of the Collateral Debt Obligations.

*Id.* § 2(b).


6.    Furthermore, the CMA clearly defines a

"Collateral Manager Breach" as follows:

> Collateral Manager Breach means (i) acts or
> omissions of the Collateral Manager . . .
> constituting bad faith, willful misconduct or
> gross negligence in the performance, or reckless
> disregard, of the obligations of the Collateral
> Manager hereunder and under the terms of the
> Indenture applicable to the Collateral Manager .
> . . .

*Id.* § 1(a).


The CMA also provides that "nothing herein shall

be deemed to protect, or purport to protect, the Collateral

Manager against liability for any Collateral Manager Breach

. . . ." *Id.* § 10(a).


7.    In early 2016, when it appeared that all of the

Secured Notes were going to be paid off by about October 2016,

46

Ellington and BK began discussing with Telos the issue of when to declare an Optional Redemption, as the remaining collateral in the deal was to be held for their benefit. Cross-Claim ¶¶ 3, 39.

8.    When an Optional Redemption occurs, the collateral is liquidated and distribution of payments is governed by an Optional Redemption "waterfall." Here, the payment distribution was expected to largely go to Ellington and BK. Indenture § 11.2.

9.    Telos, as collateral manager, was to receive an ICM Fee. The Indenture defines the ICM Fee as follows:

> Incentive Collateral Management Fee means a fee payable on each Distribution Date on or after the Distribution Date on which the Subordinated Noteholders have received or will receive an annualized Internal Rate of Return of at least 12% for the period from the Closing Date to such Distribution Date (after taking into account any payments made or to be made on the Subordinated Notes on such Distribution Date and all prior Distribution Dates in accordance with the Priority of Payments), in an amount, with respect to any Distribution Date, equal to 20% of (x) the Interest Proceeds (if any) available after the payment of amounts pursuant to clauses (A) through (U) of Section 11.1(a)(i) and (y) the Principal Proceeds (if any) available after the payment of amounts pursuant to clauses (A) through (O) of Section 11.1(a)(ii).

*Id.* § 1.1.

10.   Indenture Section 11.1(a)(i) sets forth how Interest Proceeds are distributed in the waterfall for ordinary-course Distribution Dates. *Id.* § 11.1(a)(i).

11.   Indenture Section 11.1(a)(ii) sets forth how Principal Proceeds are distributed in the waterfall for ordinary-course Distribution Dates. Paragraph 32 of the Amended Interpleader Complaint refers to these two waterfalls together as the "regular waterfall." *Id.*

12.   The Indenture does not contemplate that Telos will receive twenty percent (20%) of all Interest Proceeds and Principal Proceeds. Instead, for ordinary-course Distribution Dates, the Indenture contemplates that there will be Interest Payments made to others in steps (A) through (U) of Section 11.1(a)(i) of the Indenture, and there will be Principal Payments made to others in steps (A) through (O) of Section 11.1(a)(ii). Thus, the ICM Fee is calculated as twenty percent (20%) of whatever amounts remain of the Interest Payments and

the Principal Payments after those prior payments are made. *Id.* §§ 11.1(a)(i) & (ii).

13. An Optional Redemption triggers its own distribution waterfall, found at Indenture Section 11.2. Paragraph 31 of the Amended Interpleader Complaint refers to this waterfall as the "Redemption Waterfall." *Id.* §§ 11.2.

14. In the Redemption Waterfall, the ICM Fee is distributed at Section 11.2(a)(M). That section caps the ICM Fee at 50% of the Interest Proceeds following earlier distributions in the payment waterfall prioritized above the payment of the ICM Fee. *Id.* § 11.2(a)(M).

15. More specifically, Section 11.2(a)(M) states that a distribution is made (following the steps outlined in Sections 11.2(a)(A) through (L)) as follows:

> to the payment to the Collateral Manager of the Incentive Collateral Management Fee (if any); provided that the amount distributable on any Distribution Date pursuant to this paragraph (M) shall not exceed 50% of the aggregate amount of Interest Proceeds remaining on such Distribution Date after the payment of all amounts payable pursuant to paragraphs (A) through (L) above; . . . .

49

*Id.*

16.  Thus, both the regular waterfall and the
Redemption Waterfall place limits on the ICM Fee; in the regular
waterfall, the 20% calculation is only made after the Trustee
makes payments pursuant to certain provisions of the Indenture,
and in the Redemption Waterfall, the 50% calculation is only
made of the remaining Interest Proceeds after the Trustee makes
payments pursuant to other provisions of the Indenture,
regardless of the amount of Principal Proceeds. *Id.* §§ 11.1 &
11.2.

17.  In early 2016, as Ellington, joined at relevant
times by BK, engaged in discussions with Telos about exercising
an Optional Redemption, Telos convinced Ellington and BK to
delay exercising the Optional Redemption by stating that many of
the deal's assets were undervalued and, therefore, that it would
be advantageous for the CLO to refrain from selling those
assets. Ellington and BK followed Telos's advice and delayed
exercising the Optional Redemption. Cross-Claim ¶ 3.

18.  In the summer of 2016, Ellington and BK informed
Telos that they would not delay exercising the Optional

Redemption beyond the October 2016 Distribution Date. In discussing the process that would thereafter occur, Telos informed Ellington and BK that it did not believe its ICM Fee would be capped upon Ellington and BK's exercising an Optional Redemption. *Id.* ¶¶ 5, 6.

19. Although Telos subsequently admitted that its view of the ICM Fee ran contrary to the clear language of Indenture Section 11.2(a)(M), Telos claimed that the Indenture had not been drafted properly, as — in Telos's view — the payment waterfall failed to provide for an incentive fee payment to which Telos believed it was entitled. *Id.* ¶ 7.

20. Despite the clear language of the Indenture limiting the ICM Fee to which Telos would be entitled, Ellington and BK decided that, rather than engaging in a protracted dispute with Telos, they would engage in discussions with Telos in an attempt to structure alternative arrangements so as to reach a resolution with Telos about the ICM Fee that it would be seeking upon the Optional Redemption. *Id.* ¶ 8.

21. However, as alleged in the Cross-Claim, Telos was acting in bad faith. Although Telos continued to engage in

discussions with Ellington and BK knowing their intent to exercise the Optional Redemption before the October 2016 Distribution Date and knowing that Ellington and BK were trying to resolve Telos' claim for an outsized ICM Fee, Telos was in fact secretly selling the assets underlying the CLO. In doing so, Telos thereby mooted any opportunity for Ellington and BK to call an Optional Redemption and increased the amount of ICM Fees. *Id.* ¶ 9.

22. At no time during the discussions did Telos ever state that it had decided to liquidate the CLO, or that, in fact, such liquidation was already occurring. No notice was provided to the Noteholders about Telos' liquidation. Nor did Telos sell the assets in the usual commercial manner, which would include seeking bids in open auctions in order to achieve the best price for the asset. Had Telos sold the assets through the usual bid process, Ellington and BK would have known that Telos was engaged in wrongful conduct in an effort to artificially increase the ICM Fees at the expense of the Subordinated Noteholders. *Id.* ¶ 10.

23. The manner and timing of the sell-off of the CLO assets was intentionally done by Telos in order to make an

inappropriate grab of funds as ICM Fees: before September 1, 2016, Telos, in its capacity as fiduciary to the Noteholders, made few sales of the CLO assets, but, as soon as Ellington and BK stated that it would be exercising the Optional Redemption by a date certain, Telos secretly liquidated virtually the entire CLO asset pool in extremely short order. *Id.* ¶¶ 12, 47.

24. Moreover, as Ellington and BK allege, Telos' secretive sale of collateral breached Section 12 of the Indenture, which permits Telos to sell only collateral that qualifies as a Defaulted Obligation, Equity Security, Credit Risk Obligation, Credit Improved Obligation, or the subjects of a Discretionary Sale. *Id.* ¶ 55; Indenture § 12.1(a).

25. As the securities comprising the collateral were not Defaulted Obligations, Equity Securities, or the subjects of a Discretionary Sale, they could only have been legitimately sold if they were Credit Risk or Credit Improved Obligations. Cross-Claim ¶ 56.

26. Telos appears to have suddenly designated at least sixteen of these assets as Credit Risk Obligations due to their being sold for a Market Value less than 99.5% of the

original purchase price at which they were initially acquired by the Issuer. *Id.* ¶ 49.

27. Though Telos suddenly classified of all of these securities as Credit Risk necessitating a sale, Telos continues to hold these very same securities in a number of other deals that it manages. According to Ellington and BK, the only explanation for Telos' inconsistent treatment of these same assets across deals is Telos's improper placement of its own interests above those of the Subordinated Noteholders. *Id.* ¶¶ 49-50.

28. Also, as alleged, Ellington, BK, and the other Subordinated Noteholders were harmed by the manner in which Telos undertook its asset sales.

29. First, because the Subordinated Noteholders are holders of equity tranche Notes, Telos' wrongful inflation of the ICM Fees sharply decreases the residual cash flow to which the Subordinated Noteholders are entitled. Indenture §§ 12.1, 12.2.

30.   Second, the manner in which Telos sold the assets
- by private, secret sales and not by competitive bids -
artificially reduced the prices at which the assets were sold.
Cross-Claim ¶¶ 13, 51.

31.   As Ellington and BK allege, Telos breached its
obligations under the CMA and violated its duties to refrain
from self-dealing, to act in good faith, and to execute
collateral sales in a commercially reasonable manner. For the
same reasons, Ellington and BK also allege that Telos engaged in
fraudulent conduct and, further, would be unjustly enriched if
the interpleaded funds were paid to it. *Id.* ¶ 19.

**IV.   Additional Facts by BNYM**

BNYM has also provided a counter-statement of facts,
summarized in relevant part below.

On October 11, 2016, the Trustee received
correspondence from Ellington objecting to the ICM Fee and the
recent sales of Collateral. Telos Answer ¶ 36; Telos Statement
of Facts ¶ 46. In that correspondence, Ellington stated that the
decision to accelerate redemption of the Notes in the deal "may

55

reflect bad faith on the part of the Trustee." Edrington Decl. ¶ 2, Ex. A.

The Trustee subsequently received several directions from Telos demanding that the Trustee distribute the ICM Fees that Telos would have been paid pursuant to the regular waterfall. Telos Answer ¶ 37-38. In Telos' October 28, 2016 letter to the Trustee, for example, Telos directed the Trustee to pay Telos the ICM Fees, alleged that the Trustee had violated the terms of the Indenture and related agreements, and "expressly reserve[s] all of their rights, including rights against the Trustee under the Indenture," implying a threat to file suit against the Trustee. Edrington Decl. ¶ 3, Ex. B; Telos Answer ¶ 38. Further, in a subsequent November 2, 2016 letter to the Trustee, Telos in fact instructed the Trustee to "please immediately file an interpleader" in the event the Trustee was not willing to immediately distribute the ICM Fees to Telos. Edrington Decl. ¶ 4, Ex. C.

On November 1, 2016, the Trustee sent a letter to both Telos and Ellington through their respective counsel notifying them that the Trustee had reviewed the correspondence from both parties and that the Trustee may file an interpleader action if

the parties did not come to an agreement on or before November 15, 2016. Answer ¶ 39 (admitting this allegation from the Complaint). On November 17, 2017, the Trustee filed this interpleader action to avoid multiple liability posed by the competing claims of Ellington and Telos.

On or about January 11, 2017, a reserve was established for Administrative Expenses with the expectation that this reserve could be used to pay for, among other things, the Trustee's fees and costs incurred in this interpleader action. Edrington Decl. ¶ 5.

The Trustee submitted requests for payment in the past but that payment was delayed for several months by Telos, purportedly for procedural reasons, before ultimately being approved. Edrington Decl. ¶ 6.

## V.  The Applicable Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts

are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of

persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "It is ordinarily sufficient for the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim . . . . [T]he nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party . . . must come forward with evidence that would be sufficient to support a jury verdict in his favor"). In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## VI. The Interpleader Action is Appropriate

As a general proposition, interpleader is increasingly favored by Courts and should not be unduly restricted. *6247 Atlas Coro. v. Marine Ins. Co., Ltd., No. 2A/C*, 155 F.R.D. 454, 462 (S.D.N.Y. 1994) ("Thus, the trend, both with regard to statutory revision and judicial interpretation, has been directed toward increasing the availability of interpleader and eliminating those technical restraints on the device that are not founded on adequate policy considerations.") (citation omitted). The existence of multiple claims to the disputed res and vexatious litigation are sufficient to sustain an interpleader action regardless of the merits of the competing claims. *See id.* ("As provided by Rule 22, interpleader is available when a stakeholder 'is or may be exposed to double or multiple liability.'") (citing Fed. R. Civ. P. 22); *see also Fidelity Brokerage Servs., LLC v. Bank of China,* 192 F. Supp. 2d 173, 177-178 (S.D.N.Y. 2002) ("[I]nterpleader is designed to protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit.").

An interpleading plaintiff has no obligation to weigh competing claims to the res; "[t]he availability of interpleader does not depend on the merits of the potential claims against the stakeholder." *William Penn Life Ins. Co. of N.Y. v. Viscuso*, 569 F. Supp. 2d 355, 359 (S.D.N.Y. 2008) (citing *Sotheby's, Inc. v. Garcia*, 802 F. Supp. 1058, 1065 (S.D.N.Y. 1992)); *see also John Hancock Mut. Life Ins. Co. v. Kraft*, 200 F.2d 952, 953 (2d Cir. 1953) ("The stakeholder should not be obliged at its peril to determine which of two claimants has the better claim."). The interpleader plaintiff "is not required to evaluate the merits of [the interpleader defendants'] conflicting claims at its peril; rather, it need only have a good-faith concern of expensive litigation and multiple liability if it responds to the instructions of certain claimants and not others." *Bache Halsey Stuart Shields Inc. v. Garmaise*, 519 F. Supp. 682, 684–685 (S.D.N.Y. 1981); *see also* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 3d § 1704 (3d ed. 2001) ("It is immaterial whether the stakeholder believes that all the claims against the fund are meritorious. Indeed, in the usual case, at least one of the claims will be quite tenuous.").

The Trustee commenced this interpleader action because it had received mutually exclusive directions from Telos and Ellington. On the one hand, Ellington directed the Trustee to not distribute the ICM Fees to Telos, claiming it would be improper for the Trustee to do so and that the Trustee may be guilty of bad faith conduct if it did so; on the other, Telos alleged that to withhold the ICM Fees would amount to a breach of the Indenture by the Trustee. *See* Edrington Decl. ¶ 3, Ex. B. By their positions, Ellington and Telos signaled that each were willing to file suit, possibly against the Trustee, in the event that their competing demands for the res were not met.

Indeed Telos' initial position adopted the position of the authorities cited above. Telos directed the Trustee to commence the interpleader if it was unwilling to immediately distribute the disputed res to Telos in November 2016. Telos' November 2, 2016 letter to the Trustee stated:

> In response to your letter dated November 1, 2016, we reiterate our request that you [the Trustee] immediately pay Telos the $2,362,097.49 Incentive Collateral Management Fee due on October 11, 2016. If you are not willing to do so, please immediately file an interpleader in the commercial division of the State of New York.

Edrington Decl. ¶ 4, Ex. C.

Throughout its submissions on the pending motion, Telos alleges that BNYM's withholding of the ICM Fees through the commencement of the interpleader action was improper. Mot. at 6-12. Telos not only authorized, but actually requested the filing of the interpleader action.

The Trustee is a disinterested stakeholder because in its Complaint and submission with respect to the pending motion, the Trustee has no interest in the outcome of the action. Compl. ¶ 5. The Trustee has made no claim to the funds in dispute nor does it dispute the amount of those funds. The Trustee brought this interpleader action to preserve the funds for the benefit of the successful claimant.

The Trustee has already conceded liability with respect to the funds. In the first paragraph of the Complaint, the Trustee has stated, "[t]his . . . interpleader action [is] brought for the purpose of adjudicating the respective rights of the interpleader defendants with respect to [the Disputed Funds]." The Complaint does not contain any allegations regarding any rights of the Trustee with respect to the funds.

Specifically, the Trustee conceded that, as of the date of the Complaint, it was liable to the Interpleader Defendants for $2,362,097.49.

With respect to the requirement that the money be deposited with the Court, the Trustee requests in the Complaint that it be allowed to hold the disputed res in an Interpleader Escrow account subject to direction by the Court during the pendency of the interpleader litigation. The Trustee proposed this procedure because it is more efficient, since it allows the Trustee to quickly distribute the disputed res to the winner of the interpleader action, and does not burden the Court with the actual administration of the funds.

With respect to the requirement that the interpleader plaintiff seeks discharge from liability, the Trustee initiated this interpleader action to seek such a discharge, particularly where both Telos and Ellington had effectively threatened suit against the Trustee if the Trustee did not follow their contradictory instructions. Compl. ¶ 7.

The filing of the interpleader action by BNYM was appropriate.

## VII.  The Motion for Summary Judgment is Denied

Early summary judgment in this action is disfavored as premature. "[S]ummary judgment should only be granted '[i]f after discovery, the non-moving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Hellstrom v. U.S. Dep't. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (citing *Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996). Courts in this district reject summary judgment motions as premature where no discovery took place prior to the motion being filed. *See id.; see also DiBella v. Hopkins*, No. 01 Civ. 11779 (DC), 2002 WL 31357812 (S.D.N.Y. Oct. 18, 2002). Further, denial of the motion is particularly appropriate where, as here, the summary judgment motion was filed before the parties had an opportunity to file responsive pleadings to the claims that are the subject of the motion. *Toussie v. Allstate Insurance Co.*, 14 Civ. 2705 (FB)(CLP), 2016 WL 5678528 (E.D.N.Y. Sept. 30, 2016).

"The purpose of a statutory interpleader action is to avoid the problem of multiple, conflicting claims to a single fund by forcing all 'claimants' to resolve their claims in one action." *Rubinbaum LLP v. Related Corp. Partners V, L.P.*, 154 F.

Supp. 2d 481, 486 (S.D.N.Y. 2001). As explained in *A&E Television Networks, LLC v. Pivot Point Entm't, LLC*, No. 10 CIV 9422 PGG, 2011 WL 182083, at \*3 (S.D.N.Y. Jan. 18, 2011):

> Interpleader is designed to prevent claimants from racing to the courthouse to obtain a judgment, and thereby obtaining a disproportionate slice of the fund before . . . fellow claimants [are] able to establish their claim. The difficulties such a race to judgment pose for the [stakeholder], and the unfairness which may result to some claimants, were among the principal evils the interpleader device was designed to remedy.

*Id.* (citing *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 533 (1967) (quotations omitted)).

The commencement of an interpleader action cannot form the basis of an interpleader defendant's counterclaims against the interpleading plaintiff. "[C]ounterclaims [that] arise from acts taken [by an interpleader plaintiff] within the rights granted to it by law in bringing its interpleader action . . . fail as a matter of law." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*, No. 98 Civ. 1756, 2001 WL 11070, at \*6 (S.D.N.Y. Jan. 4, 2001) (brackets and internal quotation marks omitted)). Furthermore, to be viable, a

counterclaim against an interpleading plaintiff must allege specific "wrongful conduct related to the events in issue" that is distinct from proper commencement of the interpleader and the corresponding non-payment of moneys to the counterclaiming defendant. *U.S. Tr. Co. of New York v. Alpert*, 10 F. Supp. 2d 290, 307 (S.D.N.Y. 1998), *aff'd sub nom. U.S. Tr. Co. of New York v. Jenner*, 168 F.3d 630 (2d Cir. 1999); *see also Bank of New York v. First Millennium, Inc.*, No. 06 Civ. 13388(CSH), 2008 WL 953619, at *7 (S.D.N.Y. Apr. 8, 2008), *aff'd* 607 F.3d 905, 922-23 (2d Cir. 2010) (only "'independent' claims for relief against the interpleader plaintiff may form proper counterclaims").

Telos' counterclaim against the Trustee and its summary judgment motion is not based on any wrongful conduct that is distinct from the subject of the interpleader complaint and stems from the Trustee's effort to have all parties' claims to the funds resolved in a single proceeding by withholding the fees that Telos claims and commencing the interpleader action. Because the Trustee's lawful commencement of this interpleader action cannot serve as the ground for Telos' counterclaim for breach of contract, Telos' motion for summary judgment dismissing the interpleader complaint and granting its

67

counterclaims against the Trustee "fail[s] as a matter of law." *Bank of New York*, 607 F.3d at 922.

The granting of the Telos motion for summary judgment would unnecessarily complicate the procedural posture of this dispute, undoubtedly giving rise to a direct action against Telos, and presumably BNYM as Trustee, to resolve precisely the issue presented by this action. No damage to Telos' ultimate position by the denial of the premature motion for summary judgment has been established.

Telos has sought to frame its motion as one "of pure contract interpretation," while casting the Subordinated Noteholder's counterclaims "challenging Telos' conduct as Collateral Manager [as] the subject of a separate dispute." Telos Br. at 1, 16. However, the grant of summary judgment in Telos' favor would effectuate exactly what the interpleader statute was designed to prevent: a race to the Courthouse. Telos would "obtain[] a disproportionate slice of the fund before [the Subordinated Noteholders would be] able to establish their claim." *A&E Television Networks*, 2011 WL 182083, at *3.

In seeking summary judgment at this early stage, Telos asserts that its claim "of pure contract interpretation" can be neatly severed from Ellington and BK's allegations of misconduct and breach of the Governing Documents, which require discovery. Telos Br. at 1. However, Telos cannot recover under a contract absent a showing that it performed its obligations under that contract. *See Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (a successful claim for breach of contract requires a party to show "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages"); *see also Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (same).

Moreover, "[w]here factual issues exist as to the commercial reasonableness of any aspect of the sale, summary judgment must be denied." *Merchants Bank of New York v. Gold Lane Corp.*, 28 A.D.3d 266, 268-69 (1st Dep't 2006); see also *Bank of China v. Chan*, 937 F.2d 780, 787 (2d Cir. 1991) (reversing grant of summary judgment on damages where defendant "raised a genuine issue of fact as to the commercial reasonableness of the Bank's handling of the company's accounts receivable"). And "whether a party to a contract has acted in

good faith generally presents a question of fact for a jury." *RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 0025 (PGG), 2013 WL 1294515, at *13 (S.D.N.Y. Mar. 30, 2013) (denying summary judgment concerning Trustee's assertion that its actions were taken in good faith pursuant to the Indenture). As Telos' own performance under the Governing Documents is crucial to its counterclaim, Telos' allegations are thus intertwined with Ellington and BK's claims condemning that performance.

As established by the facts as stated by the parties and as set forth above, there are material issues of fact with respect to Telos' performance of its obligations and duties. Telos' summary judgment motion is therefore denied as premature, as an inappropriate invalidation of the interpleader action, and as barred by issues of material facts.

## VIII. The Motion With Respect to Fees is Withdrawn

Telos has disputed that BNYM is permitted, pursuant to the Indenture, to "pay for the costs of this suit" out of the interpleaded funds. Compl. ¶ 48. BNYM has asserted in its opposition brief that it would only attempt to pay its legal

70

fees and costs incurred in connection with the instant action from the "disputed res as a backup to the reserve should Telos decide to restrict payment of fees in the future or should this reserve be prematurely depleted." BNYM Opp'n 12. Telos has therefore withdrawn, without prejudice and without conceding any of the arguments in BNYM's opposition, and with a full reservation of rights, the portion of the instant motion concerning the source of payment for BNYM's legal fees and costs. Telos Reply Mem. at 18.

## IX. Conclusion

Telos' motion for summary judgment is denied. The parties will meet and confer with respect to a scheduling order to be submitted to the Court. A pretrial conference will be held if necessary to resolve any issues which the parties may wish to present.

It is so ordered.

**New York, NY**
**August 7, 2017**

ROBERT W. SWEET
U.S.D.J.